UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Ketler Bossé,
        Plaintiff

        v.                                Case No. 19-cv-016-SM
                                           Opinion No. 2019 DNH 190
New York Life Insurance Company,
New York Life Insurance and Annuity
Corp., and New York Life Insurance
Company of Arizona,
        Defendants


                            **O R D E R**


        Plaintiff Ketler Bossé filed suit against defendants, New

York Life Insurance Company, New York Life Insurance and Annuity

Corp., and New York Life Insurance Company of Arizona

(collectively, "New York Life"), asserting various federal and

state employment-related claims arising out of Bossé's 14-year

affiliation with New York Life.  New York Life demands that the

claims be arbitrated, based on an arbitration clause found in a

2004 employment contract.  Pending arbitration, New York Life

seeks to have this case dismissed or stayed.  Failing that, New

York Life moves to dismiss Count III of Bossé's complaint

(conspiracy to interfere with Bossé's civil rights) for failure

to state a claim.  Bossé objects.

## BACKGROUND

Bossé was affiliated with New York Life in a variety of
capacities for well over a decade. He began working as a
soliciting agent in the company's New Hampshire office in 2001.
At that time, Bossé signed an Agent's Contract, which authorized
him to "solicit applications for individual life insurance
policies, individual annuity policies, individual health
insurance policies, group insurance policies, and group annuity
policies" on the company's behalf. Compl., Exh. C. As an
"agent," Bossé was an independent contractor. He earned
commissions based on a percentage of first-year and renewal
premiums generated from his sales of New York Life insurance
products. The Agent's Contract did not include an agreement to
arbitrate any disputes that might arise out of that contractual
relationship.

In 2004, Bossé became an employee of the company, entering
into a "Partner's Employment Agreement" with New York Life
("Partner's Agreement"). Paragraph Five of the Partner's
Agreement is an arbitration clause that reads as follows:

> The Partner and New York Life agree that any dispute,
> claim or controversy arising between them, including
> those alleging employment discrimination (including
> sexual harassment and age and race discrimination) in
> violation of a statute (hereinafter "the Claim"), as
> well as any dispute as to whether such Claim is
> arbitrable, shall be resolved by an arbitration

proceeding administered by the NASD in accordance with
its arbitration rules.

Marquez Decl., Exh. A, at ¶ 5(a). The Partner's Agreement also

provides that the arbitration obligation survives termination of

the agreement itself. Id. at ¶ 10.

New York Life says the arbitration provision was

specifically drafted to take into account the "history between

New York Life and its many employees and agents." Defs.' Mem.

in Supp. of Mot. to Dismiss at 6. New York Life explains that

the company and its employees "contemplate an ongoing

relationship" at the outset, that over the years "may take a

variety of forms: agent, district agent, sales manager,

registered representative, corporate employee." Id. So, say

defendants, to avoid a "patchwork resolution system," the

Partner's Agreement provides for arbitration of all claims,

including those claims that may arise in a later stage of the

anticipated relationship. (It is not clear why, given that

explanation, the earlier 2001 Agent's Contract did not include

an obligation to arbitrate any disputes that may arise in later

stages of an anticipated ongoing relationship.)

In 2005, Bossé transitioned back to an Agent's position (no

arbitration agreement). In 2013, Bossé became a District Agent

and, again, his contract with New York Life contained no

arbitration agreement.  As a District Agent, Bossé could establish his own firm separate from the New Hampshire New York Life office, and hire his own agents.  Whether the District Agent Agreement Bossé signed was ever executed by New York Life is unclear at this point.

As a District Agent, Bossé opened his own office, at significant personal cost, and hired several other agents. Bossé was New York Life's first African-American District Agent. The agents he hired were racially diverse.  According to Bossé, that racial diversity provoked a strong reaction of racial animus and discrimination from some New York Life associates. As a result, Bossé alleges that the company: failed to process and underwrite insurance applications submitted by Bossé and his agents; engaged in back billing that undermined Bossé and his agents; and "stole or drove away" agents Bossé hired to work in his office.  Compl. ¶ 41.  Bossé further alleges that the company treated him differently than similarly situated New York Life District Agents who were white, and failed to investigate the disparate treatment complaints he made.

On January 15, 2016, New York Life terminated Bossé's District Agent Contract, purportedly based on inaccuracies found in the electronic application process related to a particular client.  Bossé contends that the termination was retaliatory,

that the reasons given by New York Life for termination were pretextual, and that his contract was actually terminated based on racial discrimination. He further contends that, following termination, New York Life defamed him to his New York Life clients, many of whom then ceased doing business with him.

Bossé filed this suit, asserting claims for discrimination and retaliation under 42 U.S.C. § 1981, conspiracy to interfere with civil rights under 42 U.S.C. § 1985, and breach of contract under 42 U.S.C. § 1981. He also asserts a host of state law claims, including claims for breach of the covenant of good faith and fair dealing, fraud, wrongful termination, tortious interference with economic advantage, violation of New Hampshire's Consumer Protection Act (RSA 358-A), breach of fiduciary duty, unjust enrichment, quantum meruit, conversion, defamation per quod, and defamation per se.

## I.   **Motion to Compel Arbitration**

Relying on the 2004 Partner's Agreement, New York Life insists that Bossé's current claims be dismissed in favor of arbitration because, under the terms of that Agreement, and provisions of the Federal Arbitration Act, he is obligated to arbitrate all claims he might have against New York Life before the Financial Industry Regulatory Authority ("FINRA").

A. <u>Discussion</u>

The Federal Arbitration Act "establishes 'a liberal federal policy favoring arbitration agreements.'" <u>Epic Sys. Corp. v. Lewis</u>, 138 S. Ct. 1612, 1621 (2018) (quoting <u>Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.</u>, 460 U.S. 1, 24 (1983)) (additional citations omitted). Accordingly, the Act "requires courts to enforce covered arbitration agreements according to their terms." <u>Lamps Plus, Inc. v. Varela</u>, 139 S. Ct. 1407, 1412 (2019) (citations omitted).

Because arbitration "is a matter of contract," "a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit." <u>Hogan v. SPAR Grp., Inc.</u>, 914 F.3d 34, 38 (1st Cir. 2019) (quoting <u>McCarthy v. Azure</u>, 22 F.3d 351, 354 (1st Cir. 1994)) (further quotations omitted). Thus, "[i]n deciding a motion to compel arbitration, a court must ascertain whether: '(i) there exists a written agreement to arbitrate' . . ." <u>Gove v. Career Sys. Dev. Corp.</u>, 689 F.3d 1, 4 (1st Cir. 2012) (quoting <u>Combined Energies v. CCI, Inc.</u>, 514 F.3d 168, 171 (1st Cir. 2008)). Finally, "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of

contracts." <u>Cullinane v. Uber Techs., Inc.</u>, 893 F.3d 53, 61

(1st Cir. 2018).

When, as here, a motion to compel arbitration is made "in

connection with a motion to dismiss or stay," the court "draw[s]

the relevant facts from the operative complaint and the

documents submitted . . . in support of the motion to compel

arbitration." <u>Hogan</u>, 914 F.3d at 36 (quoting <u>Cullinane</u>, 893

F.3d at 55).

The Partner's Agreement upon which defendants rely was

terminated in 2005 when Bossé transitioned back to an Agent's

position.  However, the Partner's Agreement is unambiguous in

providing that the arbitration clause <u>survives</u> termination of

that agreement.  Bossé notes that the facts and circumstances

that gave rise to this suit occurred over 12 years after the

Partner's Agreement expired, while he was working as an

independent contractor under two different agreements with the

defendants, neither of which included an arbitration obligation.

He argues that, even if the arbitration clause "survived

termination" of the Partner's Agreement, it cannot reasonably be

applied to these claims because they are completely unrelated

and unconnected to the Partner's Agreement, and because they

arose so long after termination of that contract.

Under the FAA, "principles of state contract law control the [court's] determination of whether a valid agreement to arbitrate exists." Campbell v. General Dynamics Govt. Sys. Corp., 407 F.3d 546, 552 (1st Cir. 2005).[1] The first issue the court must resolve – indeed, the only issue the court must resolve, since the arbitration agreement vests the arbitrator with the authority to determine what particular claims arising out of the contract are subject to arbitration – is just that: whether, under the FAA, a valid agreement to arbitrate exists. The answer to that question in this case is "no." There is not an enforceable agreement to arbitrate the claims brought in this case.

Arbitration "is a matter of consent, not coercion." Volt Info. Scis., Inc. v. Board of Trustees of Leland Stanford Univ., 489 U.S. 468, 479 (1989). Accordingly, arbitration of a claim is appropriate "only where the court is satisfied that the parties agreed to arbitrate that dispute." Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 297 (2010) (citations

---

[1] The Partner's Agreement states that it will be "governed by and interpreted in accordance with the laws of the State of New York without regard to conflict of law rules." Marquez Decl., Exh. A, at ¶ 8. Neither party directly confronts the choice-of-law question. (Plaintiff at least acknowledges the contractual provision. See, e.g., Obj. to Mot. to Dismiss at 9.) But, whether the law of New Hampshire (forum state) or New York is applied, the result would be the same.

omitted) (emphasis in original). "An arbitration agreement is logically and necessarily tied to the underlying contract that specifies arbitration as the agreed upon method of dispute resolution." <u>Tillman v. The Hertz Corp</u>., No. 16 C 4242, 2016 WL 5934094, at *2 (N.D. Ill. Oct. 11, 2016) (citing <u>Coors Brewing Co. v. Molson Breweries</u>, 51 F.3d 1511, 1516 (10th Cir. 1995) (a party cannot be compelled to arbitrate an unrelated dispute where "it is simply fortuitous that the parties happened to have a contractual relationship"). <u>Cf</u>., <u>Breda v. Cellco Partnership</u>, 934 F.3d 1, 7(1st Cir. 2019) ("Claims arising after the expiration of a contract containing an arbitration provision . . . are only presumed to be subject to arbitration if the 'dispute has its real source in the contract.'") (quoting <u>Litton Fin. Printing Div. v. NLRB</u>, 501 U.S. 190, 205 (1991)). When arbitration provisions "are read as standing free from any [underlying] agreement," "absurd results ensue." <u>Smith v. Steinkamp</u>, 318 F.3d 775, 777 (7th Cir. 2003).

Turning to the applicable state law, it is well-settled that "there must be a meeting of the minds in order to form a valid contract," which "is present when the parties assent to the same terms." <u>Chisholm v. Ultima Nashua Indus. Corp.</u>, 150 N.H. 141, 145 (2003) (citations omitted). <u>See also</u> <u>Kowalchuk v. Stroup</u>, 61 A.D.3d 118, 121 (N.Y. App. Div. 1st Dept. 2009)

("That meeting of the minds must include agreement on all
essential terms.")(citations omitted).  "The intent of the
parties is determined by an objective standard, and not by
actual mental assent."  Int'l Bus. Machines Corp. v. Khoury, 170
N.H. 492, 500 (2017) (quoting Tsiatsios v. Tsiatsios, 140 N.H.
173, 178, (1995)).  Cf., Starke v. SquareTrade, Inc., 913 F.3d
279, 289 (2d Cir. 2019) ("Generally, courts look to the basic
elements of the offer and the acceptance to determine whether
there was an objective meeting of the minds sufficient to give
rise to a binding and enforceable contract.") (citing Express
Indus. & Terminal Corp. v. N.Y. Dept. of Transp., 715 N.E. 1050
(N.Y. 1999)).  "An objective standard places a reasonable person
in the position of the parties, and interprets [contractual
terms] according to what a reasonable person would expect [them]
to mean under the circumstances."  Int'l Bus. Machines Corp.,
170 N.H. at 500 (quoting Behrens v. S.P. Constr. Co., 153 N.H.
498, 502 (2006)).  See also Ashwood Capital, Inc. v. OTG Mgmt.,
Inc., 99 A.D.3d 1, 6, (N.Y. App. Div. 2012) ("to determine the
contracting parties' intent, a court looks to the objective
meaning of contractual language, not to the parties' individual
subjective understanding of it.").

Given the unrestrained language used in the arbitration
clause, one might take the view – and defendants seemingly do –

that the arbitration clause is so expansive that it literally

covers any conceivable dispute that might arise between the

contracting parties at any time in the future, and under any set

of facts or circumstances.  Under that reading, Bossé's current

claims would be covered.  They are, after all, disputes with New

York Life, and they have arisen in time, and both the nature of

the disputes and the time of accrual, or assertion, are

unimportant given the expansive language used.  The language

used also excludes any "relatedness" requirement.  That is,

there are no words used that explicitly limit the clause's

application to only those disputes bearing some relationship to

or having some connection to the contract in which it is found.

The arbitration provision, by its terms, purports to apply to

"any dispute, claim or controversy arising between" the parties.

Such a broad interpretation, however, is problematic for

several reasons.  First, as the Supreme Court has noted, "[t]he

object of an arbitration clause is to implement a contract, not

to transcend it."  Litton Fin. Printing Div., a Div. of Litton

Bus. Sys., Inc. v. N.L.R.B., 501 U.S. 190, 205 (1991).  No

reasonable person in either Bossé's position or New York Life's

position would have understood the 2004 Partner's Agreement

arbitration provision (and survival provision) to require

arbitration of any and all future claims of whatever nature or

type, no matter how unrelated to the Partner's Agreement, and no matter how distant in the future the claim arose. For example, a reasonable person signing the Partner's Agreement would hardly think that a slip and fall injury suffered by plaintiff on New York Life property 30 years in the future, and 25 years after any work or other relationship terminated, would be subject to arbitration under that particular clause. Defendants' current position – that the Partner's Agreement obligates the parties to arbitrate any and every dispute between them, no matter what it is and no matter when it arises – is unbounded to the point of absurdity. Defendants' proffered construction of the arbitration clause would not only transcend the purpose and terms of the Partner's Agreement, but would operate to deprive employees of all future rights to either a jury trial or court resolution of completely unrelated matters arising generations in the future.

Wexler v. AT&T Corp., 211 F. Supp.3d 500, 503 (E.D.N.Y. 2016), applying New York law, is not only instructive, but particularly relevant here, given the parties' election to adhere to New York's law. In Wexler, plaintiff filed a Telephone Consumer Protection Act claim against AT&T, and AT&T moved to moved to compel arbitration based on a Service Agreement, under the terms of which plaintiff agreed to

arbitrate "all disputes and claims" between the parties.

Although that Service Agreement had expired, AT&T argued that

the arbitration provision survived.  The court was unpersuaded,

finding "an arbitration clause that is unlimited in scope

presents a question of contract formation."  Id. at 504.  The

court explained that, under New York law, a contract's language:

> must be judged according to "what an objective,
> reasonable person would have understood [them] to
> convey."  Leonard v. PepsiCo, Inc., 88 F. Supp.2d 116,
> 127 (S.D.N.Y. 1999) (citing Kay-R Elec. Corp. v. Stone
> & Webster Constr. Co., 23 F.3d 55, 57 (2d Cir. 1994)).
> Notwithstanding the literal meaning of the clause's
> language, no reasonable person would think that
> checking a box accepting the "terms and conditions"
> necessary to obtain cell phone service would obligate
> them to arbitrate literally every possible dispute he
> or she might have with the service provider, let alone
> all of the affiliates under AT&T Inc.'s corporate
> umbrella — including those who provide services
> unrelated to cell phone coverage.  Rather, a
> reasonable person would be expressing, at most, an
> intent to agree to arbitrate disputes connected in
> some way to the service agreement with [defendant].
> As explained above, [plaintiff's] claims are not so
> connected.  If a company wishes to bind its customers
> to something broader, it must take steps to secure
> something that a reasonable person would understand as
> an objective expression of his or her agreement.
> Whether framed in terms of unconscionability or
> contract formation, the end result is the same: the
> arbitration clause is not enforced.

Wexler, 211 F. Supp. 3d at 504-05 (alterations in original).

See also Hearn v. Comcast Cable Comm., LLC, No. 1:19-CV-1198-

TWT, 2019 WL 5305460 (N.D. Ga. Oct. 21, 2019) (same).  The

Wexler court also noted that the "FAA explicitly limits itself

to agreements 'to settle by arbitration a controversy thereafter <u>arising out of such contract or transaction, or the refusal to perform the whole or any part thereof</u>.'" <u>Id</u>. at 505 (quoting 9 U.S.C. § 2 (emphasis added)). That is, the Federal Arbitration Act itself requires that an arbitration clause have some relationship to, some connection with, the agreement or contract, as a condition of federal enforcement.

Defendants rely upon the recent Supreme Court decision in <u>Henry Schein, Inc. v. Archer & White Sales, Inc.</u>, 139 S. Ct. 524 (U.S. 2019), in arguing that, essentially, only an arbitrator can determine whether the arbitration clause should be enforced, and what its reach might be. But, that decision does not address the preliminary issue in this case.

In <u>Schein</u>, the Supreme Court clarified a specific point. When a contract includes an arbitration clause, and the scope of that clause – <u>i.e</u>, whether a particular dispute arising out of that contract is subject to arbitration – is a matter committed to the arbitrator, then a court must defer to the arbitrator with respect to the clause's reach. That is so even if, in the court's view, a claim that the arbitration agreement applies to a particular contractual dispute is "wholly groundless," or even frivolous. <u>Id</u>. at 530. But, consistent with the FAA, <u>Schein</u> presupposes a dispute <u>arising out of the contract or transaction</u>

– i.e. some minimal relationship or connection between the contract and the dispute.  That is because, under the Federal Arbitration Act, contractual arbitration clauses are "valid, irrevocable, and enforceable" if they purport to require settlement by arbitration of any "controversy thereafter arising out of such contract."  9 U.S.C. § 2.  The Supreme Court, in Schein, plainly understood that the Act requires enforcement of arbitration clauses with respect to disputes "thereafter arising out of such contract." Schein, 139 S. Ct. at 530 (quoting 9 U.S.C. § 2) (emphasis added).  The Act does not provide for enforcement of arbitration clauses with respect to disputes plainly not "arising out of such contract."

The additional notion proposed by defendants – that an arbitration survival clause creates a perpetual obligation to arbitrate any conceivable legal or equitable claim of any nature that plaintiff might ever have against the company, to include the myriad of potential disputes that unarguably do not "thereafter aris[e] out of such contract," id., – is plainly inconsistent with the Act's explicit relatedness requirement, and is otherwise unenforceable either due to lack of contract formation (meeting of the minds), or unconscionability.

Defendants' position also contravenes the public policy underlying statutes of limitations.  Courts have generally

refused "to permit parties to extend the limitations period
beyond [those] legislatively determined" by means of contractual
provisions.  GRT, Inc. v. Marathon GTF Tech., Ltd., No. CIV.A.
5571-CS, 2011 WL 2682898, at *15 (Del. Ch. July 11, 2011)
(survival clause that "provides that the representations and
warranties will survive indefinitely[] is treated as if it
expressly provided that the representations and warranties would
survive for the applicable statute of limitations.").  See W.
Gate Vill. Ass'n v. Dubois, 145 N.H. 293, 298-99 (2000)
("[plaintiff] is seeking to circumvent the legislature's
declaration of public policy in RSA 508:4, I, by contractually
extending the three-year statute of limitations before any cause
of action exists.  Such an agreement 'is unenforceable because a
party cannot in advance, make a valid promise that a statute
founded in public policy shall be inoperative.'") (quoting John
J. Kassner & Co. v. City of New York, 46 N.Y.2d 544, 415
N.Y.S.2d 785, 389 N.E.2d 99, 103 (1979)).  Thus, defendants'
proposed construction of the parties' arbitration obligation as
eternal and unrestrained is also unpersuasive because it is
contrary to public policy.

    Bossé's current claims are not tethered to, or related in
any way to, the 2004 Partner's Agreement or the relationship
established by that agreement, and New York Life does not claim

otherwise.  Accordingly, for the reasons given, defendants'
motion to compel arbitration is denied.

## II.  **Motion to Dismiss Count III**

### A. Standard of Review

When ruling on a motion to dismiss under Fed. R. Civ. P.
12(b)(6), the court must "accept as true all well-pleaded facts
set out in the complaint and indulge all reasonable inferences
in favor of the pleader."  SEC v. Tambone, 597 F.3d 436, 441
(1st Cir. 2010).  Although the complaint need only contain "a
short and plain statement of the claim showing that the pleader
is entitled to relief," Fed. R. Civ. P. 8(a)(2), it must allege
each of the essential elements of a viable cause of action and
"contain sufficient factual matter, accepted as true, to state a
claim to relief that is plausible on its face," Ashcroft v.
Iqbal, 556 U.S. 662, 678 (2009) (citation and internal
punctuation omitted).

### B. Discussion

Defendants have moved to dismiss Count III of Bossé's
complaint, conspiracy to interfere with civil rights.  To state
a claim for a civil rights conspiracy, "[f]irst, the plaintiff
must allege a conspiracy; second, [he] must allege a
conspiratorial purpose to deprive the equal protection of the
laws; third, [he] must identify an overt act in furtherance of

the conspiracy; and finally, [he] must show either injury to person or property, or a deprivation of a constitutionally protected right." <u>Parker v. Landry</u>, 935 F.3d 9, 18 (1st Cir. 2019) (quoting <u>Pérez-Sánchez v. Pub. Bldg. Auth.</u>, 531 F.3d 104, 107 (1st Cir. 2008)).

Bossé alleges that James Robbins, New York Life's Director of Operations for the New Hampshire Office, used his position to influence other New York Life employees, including, but not limited to, New York Life Compliance Office and Senior Associate, Nicholas Inglese, past Managing Partner of New York Life's New Hampshire Office, Steven Irish, and others, in a civil conspiracy to intentionally deprive Bossé of his right to equal protection under the law." Compl. ¶ 132. In support of that allegation, Bossé asserts that Robbins, Irish and Inglese:

> (1) delay[ed] processing orders for Mr. Bossé and his new agents who depended on that income; (2) maliciously den[ied] Mr. Bossé advance commissions, thereby taking away his income and livelihood; (3) allow[ed] New York Life agents working out of the New Hampshire office to take clients from Mr. Bossé to give [the white agents] a chance, and/or forcing Mr. Bossé to share his commissions with white agents;" (4) attribute[ed] the credit of hiring new and experienced agents groomed by Mr. Bossé to white agents; (5) causing multiple withdrawals from client accounts without Mr. Bossé's advance knowledge, causing those clients to cut ties with Mr. Bossé; and (6) publicly and privately disparaging or allowing others to publicly and privately disparage Mr. Bossé's diverse ethnic agents, including but not limited to, using racial slurs when referring to them.

Compl. p. 3.  Throughout his complaint, Bossé details multiple instances of the conduct he alleges.  See, e.g., ¶ 41 – 45, 46, 49, 51, 54, 57.

Defendants argue that Count III must be dismissed for two reasons.  First, defendants say, Bossé's pleadings fail to implicate two or more defendants, instead mentioning only three of New York Life's individual employees, each of whom acted as an agent of one company – New York Life.  Defendants invoke the "intracorporate-conspiracy doctrine," which holds that "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy."  Ziglar v. Abbasi, ____ U.S. ____, 137 S. Ct. 1843, 1867 (2017) (citations omitted).  That is because "[w]hen two [or more] agents of the same legal entity make an agreement in the course of their official duties, ... as a practical and legal matter their acts are attributed to their principal."  Id. "And it then follows that there has not been an agreement between two or more separate people," as required to establish a conspiracy.  Id.

The Supreme Court recently considered, but did not resolve, the proper application of the intracorporate conspiracy doctrine

to civil rights conspiracy claims brought under Section 1985(3).

Ziglar, 137 S. Ct. at 1867. It noted:

> To be sure, this Court has not given its approval to
> this doctrine in the specific context of § 1985(3).
> There is a division in the courts of appeals,
> moreover, respecting the validity or correctness of
> the intracorporate-conspiracy doctrine with reference
> to § 1985 conspiracies.  Nothing in this opinion
> should be interpreted as either approving or
> disapproving the intracorporate-conspiracy doctrine's
> application in the context of an alleged § 1985(3)
> violation.  The Court might determine, in some later
> case, that different considerations apply to a
> conspiracy respecting equal protection guarantees, as
> distinct from a conspiracy in the antitrust context.

Id. at 1868 (internal citations omitted).

Whether and how the intercorporate-conspiracy doctrine

might apply to Section 1985(3) claims remains unsettled then –

at least on a national level.  Our court of appeals, however,

has expressed doubt about applying the doctrine outside the

antitrust context.  See, Stathos v. Bowden, 728 F.2d 15, 20-21

(1st Cir. 1984) ("We doubt that this 'intracorporate' exception

should be read broadly.  The cases employing it have rested in

large part on precedent drawn from the antitrust field.").  On

the other hand, however, the court has applied the principle in

a case not much different than this one.  See, Rice v. President

& Fellows of Harvard Coll., 663 F.2d 336, 338 (1st Cir. 1981)

("The fatal defect in this claim is that [plaintiff] has sued

only the President and Fellows of Harvard College, which is a single corporate entity and, therefore, unable to conspire with itself in violation of [Section] 1985(3).").

In Stathos, 728 F.2d at 17, plaintiff brought a sex discrimination action against a governmental body and several of its agents.  The court upheld a jury verdict of liability under Section 1985(3), stating:

> Where "equal protection" is at issue, however, one
> cannot readily distinguish in terms of harm between
> the individual conduct of one enterprise and the joint
> conduct of several.  Nor can one readily identify
> desirable social conduct as typically engaged in
> jointly by the officers of a single enterprise.  Thus,
> the boundaries of an "intracorporate" exception to the
> § 1985(3) conspiracy provision should be narrower than
> in antitrust.  Indeed, we do not see why they should
> extend — if at all — beyond the ministerial acts of
> several executives needed to carry out a single
> discretionary decision.

Stathos, 728 F.2d at 21 (citations omitted).  The defendants' conduct in Stathos "involved a series of acts over time going well beyond simple ratification of a managerial decision by directors.  It consisted of joint discretionary activity – with many words and several deeds – engaged in by each of the Commissioners."  Id. at 21 (citations omitted).  Given that circumstance, the court held that the intracorporate exception did not apply.  Id.

Stathos's analysis has been criticized.  See, e.g., Johnson v. Nyack Hosp., 954 F. Supp. 717, 724 (S.D.N.Y. 1997) ("such a line responds neither to the text nor to the objectives of Section § 1985.  Section 1985 depends on multiple actors, not on multiple acts of discrimination or retaliation.") (quoting Travis v. Gary Community Mental Health Ctr., Inc., 921 F.2d 108, 110 (7th Cir. 1990)).  But, it remains the law in this Circuit, and it seems to contradict Rice.  Defendants have not offered a convincing argument as to why the later Stathos decision should not apply in this case.  In his complaint, Bossé does plausibly allege a series of acts over time involving several individuals well beyond the ministerial acts of several people needed to carry out a single discretionary corporate decision.  Accordingly, for now, at this early stage, the intracorporate conspiracy doctrine will not be applied at Bossé's civil rights conspiracy claim.[2]

Defendants' additional arguments in favor of dismissal of Bossé's civil rights conspiracy claim are similarly unavailing.  Bossé's factual allegations are somewhat meagre, but they are sufficient at this stage to withstand the defendants' motion to

---

[2]    The court is willing to reconsider the applicability of the doctrine at summary judgment with the benefit of a fully developed record.

dismiss.  Defendants' motion to dismiss Count III of the
complaint is therefore denied.

## CONCLUSION

For the foregoing reasons, as well as those stated in
plaintiff's briefing, defendants' motion to compel arbitration,
and stay these proceedings (document no. 9) is **DENIED**, and
defendants' motion to dismiss (document no. 9) is **DENIED**.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

November 13, 2019

cc:  All counsel of record